IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 19, 2010

## STATE OF TENNESSEE v. JACKIE L. DOZIER

**Direct Appeal from the Criminal Court for Macon County**
**No. 06-35   Jane Wheatcraft, Judge**

_____

**No. M2009-01515-CCA-R3-CD - Filed October 29, 2010**

_____

A Macon County jury convicted the Defendant, Jackie L. Dozier, of three counts of sexual battery, three counts of incest, and one count of attempted sexual battery. The trial court imposed a total effective sentence of nine years, ordering the Defendant to serve two years of his sentence in jail and the rest on probation. In this appeal, the Defendant contends the trial court erred when it: (1) denied his Motion for Judgment of Acquittal; (2) imposed consecutive sentencing; and (3) imposed a period of confinement in excess of one year as part of a sentence of split confinement. After a thorough review of the record and relevant authorities, we conclude the evidence supports the Defendant's convictions, but the trial court erred when it sentenced the Defendant. As such, we affirm the Defendant's convictions, but we reverse the trial court's imposition of consecutive sentencing and order the Defendant's sentences to be served concurrently.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
in Part, Reversed in Part, and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

G. Frank Lannom and Melanie Bean, Lebanon, Tennessee (at trial); and James O. Martin, III, Nashville, Tennessee, and Comer Donnell, Lebanon, Tennessee (on appeal); for the Appellant, Jackie L. Dozier.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Senior Counsel; Tom P. Thompson, District Attorney General; Tom Swink and Linda Walls, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from the Defendant's sexual assault of his sister. Both were adults at the time of the Defendant's conduct. Based upon this conduct, a Macon County grand jury indicted the Defendant for three counts of rape, three counts of incest, and one count of attempted rape.

## A. Trial

At the Defendant's trial, the following evidence was presented: Officer Steve Evans, Assistant Chief of Police of the Red Boiling Springs Police Department, received the victim's first report of the Defendant's conduct against her. The victim and her husband, who were personally acquainted with the officer, arrived at the officer's house on July 28, 2005, around 9:00 p.m. and appeared very distraught, so the officer calmed them down and listened to the victim's account of how the Defendant, her brother, had raped her. She said that, three days earlier, on July 25, 2008, the Defendant came to her home and gave her a shot to treat migraine pain she was experiencing. She said she fell asleep due to the medication but awoke and "caught him in the act of having sex with her, or attempting to have sex with her." The victim explained she did not immediately report the Defendant's conduct to police because she was embarrassed, given that the Defendant was her brother. She explained that, that morning, the same day she and her husband later went to Officer Evans's house, her brother had returned to her home and tried to rape her again. This prompted the victim to disclose the abuse to her husband, and the two decided to seek the officer's help. Officer Evans explained to the victim that, because she was not physically examined shortly after the rape, the only evidence against the Defendant would be her story, which probably would not be enough to support an indictment against the Defendant. He advised the victim to set up a meeting or a conversation between herself and the Defendant so that she could covertly record the Defendant admitting he raped her.

The victim initially resisted the idea of meeting with the Defendant again. However, when Officer Evans reiterated to the victim the importance of such an admission by the Defendant, the victim relented. The officer testified that he instructed the victim to "just act like there's nothing wrong" next time the Defendant contacted her and to let the Defendant "think that [he and the victim were] going to get together again."

In mid-November, the victim informed the officer that her brother had resumed calling her. Officer Evans then acquired the victim's written permission to install a recording device on her phone and did so the morning of November 21. He recalled that, because the victim was very distraught the morning he installed the device, he had to encourage her to stay calm

2

in order to avoid alerting the Defendant to the fact their conversation was being recorded.

The victim called the officer back several hours later to tell him her brother had called again but that the call had been dropped. The officer returned to the victim's home, listened to the tape of their conversation before they were cut off, and determined that more information was needed to inculpate the Defendant. Officer Evans identified a few topics toward which the victim should "steer" her brother. In order to ensure the Defendant would call again while the recording equipment was set up, the officer had earlier told the victim to plan a time and date to meet with the Defendant when she spoke with him on the phone. The victim had done so, and, while Officer Evans was still in the victim's home, the Defendant called the victim back.

While the victim and the Defendant resumed their conversation, Officer Evans sat where he could hear both sides of the conversation. He recognized the Defendant's voice because he knew the Defendant from the Defendant's work as a local emergency medical technician ("EMT"). The victim frequently looked to the officer for guidance, and he prompted her to talk more about certain topics in order to elicit certain responses from her brother. Officer Evans continually had to calm the victim down during the conversation.

After the victim hung up, the officer collected the tape and placed it into evidence at the local police precinct. The State introduced the tape and a transcript of its contents into evidence and played the tape for the jury.

During the conversation, the Defendant first stated that he wanted to make sure that the victim was "still on for tomorrow" before he "lined everything up," apparently referring to the victim's agreement (at Officer Evans's suggestion) to meet her brother so he could give her drugs and have sex with her. The victim responded by asking the Defendant whether he's going to give her Stadol and whether he had given her Stadol in the past. The Defendant responded that he would give her Stadol and anything else she wanted.

The victim then asked the Defendant, "Just tell me something. . . . Why do you want to do this?" and the following exchange ensued:

[Defendant]: I don't know. It's just the thrill behind it I guess
[victim]: I'm your sister Jackie
[D]: Well it ain't like we ain't done it before
[v]: Yeah, but I don't even remember
[D]: Oh you do too. You were wide-awake
[v]: I do not
[D]: the last two times we done it

3

| [v]: | I was not Jackie[.] I don't even remember |
| [D]: | I don't know what you was on then, but it wasn't nothing that you was doing cause you was wide awake talking to me just like you are right now. |
| [v]: | No Jackie[.] I don't remember it[.] |
| | . . . . |
| [D]: | . . . I've already gave you something twice and you've told me twice already that you would.  And now I gave you something again the other day and you said tomorrow definite. |

The victim again denied being awake to recall anything that happened after the Defendant sedated her, and the Defendant agreed that she may have been too "zonked" to remember having sex with him: "Now you may not [remember the first two times] because I mean you was a little bit zonked, but you was telling me what to do."

The victim continued insisting to her brother that she did not remember the sexual encounters and saying that such an encounter was "sick."  He responded that "[i]t wasn't sick," repeatedly saying that the victim "enjoyed it."  The victim continued to deny either remembering or enjoying anything, and the Defendant responded that she "may be blocking it out" but that she was "stone sober the very last time."  She denied this, but he insisted that, at her insistence, he had only "put [her] down" after they had sexual intercourse on July 25, 2005.  The call was lost at this point.

When the Defendant and the victim resumed their conversation the same day, apparently afraid the victim would back out of having sex with him again, the Defendant asked, "[Y]ou ain't having second thoughts are you?"  When the victim was unequivocal, the Defendant pressed her, saying that it was "just pure clean pleasure" because she could not become pregnant:

> The way . . . I look at it is there ain't nothing wrong with it if it ain't harming nothing.  I meant you can't get pregnant so there ain't no harm in nothing[.  It's] just pure clean pleasure both ways.  And nobody's gonna know nothing cause nobody's gonna suspect it for one thing, and for the other thing is I'm not gonna tell nobody.

The victim then asked her brother how he obtained the medication he used to sedate her, and he responded "I've got my ways."

When the victim began questioning the Defendant about exactly how many times he had sedated her and had sex with her, the Defendant asked the victim whether she was

4

recording him and became increasingly defensive, saying he would "take a polygraph and back up everything." He repeatedly told his sister that, though the medication may have "kicked in beforehand," she was "in it just as much as" he himself was. He continued to tell her she had initiated the sexual encounter and that she "asked [him] for it." When the victim finally declared, "No. . . . You know what I never consented to do anything sexual with you," the Defendant responded, "I don't guess you–whatever you say." The two then angrily disagreed about what happened the day the Defendant locked the victim in her bedroom, and they quickly ended the call. The victim told Officer Evans this phone conversation was when she first became aware her brother had sex with her each of the two times he sedated her in 2004.

Based upon the victim's statements to police and upon the Defendant's statements during his recorded conversation with the victim, police summoned the Defendant to the police station and informed him of his sister's allegations. The Defendant denied both giving his sister a shot and having sexual contact with her. When asked why his sister would make up such allegations, he said his sister was angry because he would not use his job to obtain pain medication for her. He claimed that his sister frequently called him, asking him for pain medication, but that he never complied. When asked whether he ever called his sister, the Defendant said that he called her "every now and then" to check on her but that she called him every time she ran out of medication, about once a month, to ask him to obtain pain medication for her.

On cross-examination, the officer confirmed that he did not tell the Defendant about the recording of his conversation with the victim when he initially interviewed the Defendant. To the best of the officer's knowledge, he was the first person the victim and her husband told about the rape. He confirmed that a document presented by the defense contained a narrative he prepared summarizing the statement the victim gave the night of July 28, 2005. According to the prepared narrative, the victim said her brother had raped her once and tried to rape her again a few days later when he came to her house, locked the victim and himself in the bedroom, and, demanding sex, attempted to inject her against her will. The narrative stated that the victim said the rape occurred sometime in the past "school year," which would have spanned between 2004 and 2005. According to the narrative, the victim said that, on this occasion, her brother administered medicine to her for migraine headache pain, she passed out and then briefly regained consciousness long enough to see her brother remove his own pants and then remove her pajama bottoms. The officer explained that he did not extract a very detailed statement from the victim the night she came to his house because he needed only enough information to initiate a formal investigation. He said this was the reason the narrative did not include the exact date of the first incident.

The officer conducted a second, more formal, interview of the victim on November

5

22, 2005, after he recorded her conversation with the Defendant. On this occasion, the victim said she had learned from her brother that he had actually raped her on more than one occasion, and the record of their interview identifies August 2004 and July 2005 as dates around which the rapes occurred. Officer Evans explained that he initially may have misunderstood that the victim was reporting several incidents of rape because the victim was very "traumatized" and upset the night she came to his house. He also said she may have actually been saying the rape she remembered occurred in July 2005, whereas he wrote that the rape she remembered at this time occurred in "the last school year." He reiterated that, because the victim was distraught, it was very possible that "either one of [them]" got the dates wrong.

Officer Evans took the November 22 statement to the local district attorney, who advised him to get a more precise account of the rapes from the victim. Accordingly, on November 29, 2005, he interviewed the victim yet again and took an even more "in depth" statement. During this interview, the victim said that one of the occasions on which her brother raped her was during July 2004. She remembered that in July 2004, as her brother began injecting her with drugs, she began to feel herself losing consciousness, which was strange because the drugs she usually took did not cause her to lose consciousness. She told her brother to stop, but he injected her with the remainder of the vial anyway. The victim called her brother again, a month later, in September.

The officer recalled that, during the November 29 interview, the victim explained why she did not initially tell him she had been raped more than once: the victim did not learn that her brother had been raping her each time he knocked her out with drugs until she spoke with him during their recorded telephone conversation. After her brother told her "she didn't mind it the other two times," the victim asked what he was referring to, and he told her that, after she passed out from the shots he had given her the previous two times, he had sex with her each time. Although her brother said they had sex a total of three times, she recalled only the third and last occasion in July 2005.

On redirect examination, the officer said that the narrative of the victim's statement given on July 28, 2005, was not the normal mechanism for recording a statement. He explained that he did not actually write down the victim's statement until the next morning when he returned to his office and summarized what he recalled from the victim's account. He agreed the narrative was not a word-for-word account of her statement, and was not signed by the victim. He said the victim did, however, review the summary he prepared of her July 29 statement and signed it to confirm its presentation of the relevant dates. He confirmed, however, that the victim could not identify the precise date of the first two rapes, which had occurred well over a year before the time of the statement. He emphasized that another reason the victim could not recall these dates with clarity is that she did not realize

at the time that she had been raped. The victim's inability to recall the exact dates did not surprise the officer.

The victim testified that in 2004 and 2005 she lived in Red Boiling Springs with her husband of nine years and her daughter from a previous marriage. In 2003, due to frequent migraines and a heart condition, the victim began receiving disability. She also suffered from high blood pressure, high cholesterol, and high triglycerides and had taken a total of nine medications each day since before the events in this case. She described the pain from her migraines, saying "[i]t just feels like there's a . . . vice on your head, and I get sick to my stomach, get nauseated. I can't stand the light. I can't stand sound. I don't want to be around anybody. Just the least little thing . . . makes my head feel[] like it's going to explode."

The victim described the evolution of her attempts to deal with her migraine pain: when she first began experiencing migraines, she tried various home remedies, such as tying a tube sock around her head. She also had a prescription medication to take at the onset of a migraine. The victim's primary care physician originally was Dr. Rutherford in Carthage, Tennessee, but, because she was unhappy with the high number of medications Dr. Rutherford was using to treat her, she switched to Dr. Ladd in Red Boiling Springs, who immediately took her off several medications. At the time of trial, the victim had recently begun taking a preventative medicine for her migraines.

When the victim experienced a migraine, if neither the home remedies nor the medication helped, someone would drive the victim, unable to drive due to the pain and disorientation, either to her doctor's office or to the emergency room for an injection, which she described as the "last resort." Usually her husband would drive home from his job in Nashville to take her to get the injection, but, when he was unable, she instead called family members and friends, including her sister, the Defendant, her son, and a neighbor.

The victim asked her brother, an EMT for the local ambulance service, on more than one occasion to transport her to get an injection. When she made one such request in August 2004, her brother agreed and arrived at her house wearing his EMT uniform and carrying a medium-sized red bag with his medical supplies, such as syringes, gauze, saline, and band-aids. The victim was lying in her pajamas on her living room couch when the Defendant arrived. According to the victim, the Defendant told her that taking her to the doctor's office was not necessary because he could administer the same medication in her home. The victim said that, because she trusted her brother, she agreed to let him give her the medication in her home.

The Defendant then took a syringe and a vial of fluid from his bag and asked her for

7

two pills of Phenergan, an anti-nausea medication the victim had a prescription for. The Defendant carried the two pills into the kitchen, out of the victim's view, turned on the stove, and told the victim he was mixing the Phenergan with saline. He emerged from the kitchen with a syringe filled with a white, cloudy liquid and told the victim the syringe carried a drug that was "just like" what she would receive at her doctor's office. He explained that the medication would work more quickly if administered intraveneously, so he tied a band around her left arm and started an IV port in the arm. The Defendant then inserted the syringe filled with the white liquid into the IV port and injected the syringe's contents into the victim's arm.

The victim testified that, as the liquid entered her body, she began feeling strange so she told her brother to stop:

> I started feeling funny and lightheaded. It was like it was . . . hitting me all at once. I was just feeling real funny, and I told him, I said, that's enough, you know, stop, stop, cause . . . what they give me at the doctor's office don't make you feel like that.
>
> . . . .
>
> This medicine that he gave me, I mean, it just–it hit me like–like when you're at the hospital being put to sleep for surgery. You know, before you ever get to start counting, you're out, and that's like what this did to me.

The victim explained at trial that, when she received injections at the doctor's office, the injections were administered in her buttocks, and they never caused her to feel dizzy or lightheaded. She typically would return home after receiving the injection, go to sleep, and, when she awoke later, her migraine would be gone. Despite the victim's instruction to stop, her brother continued to inject her with the rest of the liquid. The victim lost consciousness as he finished injecting the liquid and recalled nothing until she awoke.

When the victim awoke, she was immediately struck by the fact that, not only was she now lying on her bed in the bedroom, but she also was lying on her husband's side of the bed, which was the side closest to the door. The victim testified that, because she never laid on this side of the bed, she assumed that she had walked into the room in her sleep and simply collapsed on the side of the bed closest to the door. Because nothing else struck her as odd about the occasion, she "didn't think anything about it."

A month later, in September 2004, the victim experienced another migraine, and her husband again could not return from work to take her to the doctor because he was working

8

"way out past Nashville." The victim first called her sister, who could not come, so she again called the Defendant and asked him to take her to the doctor's office. The Defendant agreed and soon arrived at her house again dressed in his EMT uniform and carrying his red bag. As he walked into her home, the Defendant said, "[J]ust let me go ahead and give you another shot. That way we don't have to go down to the doctor's office." The victim testified that, because she was "stupid" and because her migraine was so bad that she was "heaving," she agreed to let the Defendant inject her again because she "just wanted [her] migraine to go away" without having to "sit and wait" at the doctor's office. She explained that she frequently got nauseated during her migraines and that vomiting usually eased the nausea. On this occasion, however, she could not vomit but only "heave."

As he prepared to inject her again, the Defendant picked up a bag in which the victim stored her medication and carried it, along with his own red bag, into the kitchen. The victim again heard the Defendant turn on the stove, and she also heard him using a metal spoon to crush pills in a metal bowl, though she did not know which pills he was crushing. The Defendant returned with a syringe filled with a cloudy, white substance similar to the one he used the month prior, and he again set up an IV port and used it to inject the liquid into the victim.

The victim said this injection caused her to feel the same "lightheaded" and "woozy" feeling she had when her brother had injected her a month earlier. She woke up under similar circumstances, as well: fully clothed and lying on the wrong side of the bed she shared with her husband. The victim denied relying on her brother for medication, stating she was able to get medication from her doctor. She testified that she had been transported to the emergency room before due to her migraines.

On July 25, 2005, nearly one year after the first time the Defendant administered drugs to his sister, the Defendant called his sister to wish her a happy birthday, as the previous day had been her birthday. The victim recalled that "it just so happened" that the previous night she had been "up and down" all night because she had been experiencing a bad migraine, so she told her brother about having been up all night dealing with her migraine. Her brother, without being asked to do so, said he would come over and take her to the doctor.

When the Defendant arrived at his sister's house, he again was dressed in his EMT uniform and carrying his red bag. The victim was lying on the couch in her pajamas. Instead of taking her to the doctor, however, the Defendant went into the kitchen with his red bag and began mixing something on the stove. The liquid in the syringe he emerged carrying this time, however, was cloudy and colorful rather than white. The Defendant injected the victim with the syringe as he had the two previous times and she again lost consciousness.

On this third occasion, the victim regained her consciousness several times before her brother left her house. When she woke up the first time, she was lying on the "opposite" side of her bed, and her brother was taking her pajama bottoms and underwear off and had already pulled them down to her ankles. She passed out again but soon woke up again long enough to see her brother standing beside her and taking off his pants. The victim again passed out, and when she woke up again, she saw her brother standing at the foot of the bed, with his back to her, putting his pants back on. She realized her pajama bottoms had been put back on. The victim testified, "That's when I realized what had happened." She was unsure of exactly what made her certain that the Defendant had raped her, saying that she had a "feeling," which she did not know how to describe, that she knew what had happened.

The victim looked over to her closet, which was open, and thought of the .22 rifle she stored there. Unable to move her legs, which she described as "jello," she rolled off the bed and reached into the closet, grabbing the gun. At this point, her brother turned around and tried to grab her arm, but she pointed the gun at him and told him to "get out," and then the victim passed out again. The victim testified that, when she came to again approximately an hour and a half later, she realized "there was semen down there around my private area." She said the semen was on her inner thigh area, in the crease of her leg, and was partially dry but some remained "gooey."

The victim began crying and, though her legs were still "wobbly," she went and showered to clean the semen from her leg. She explained she showered because of "what her brother had done to [her]," and said, "That was so sick. I was so ashamed. I couldn't believe it." The victim pulled all the covers from the bed and threw them away.

The victim explained that she did not immediately report the rape to police due to her extreme embarrassment, saying: "That was my brother. How do you tell something like that? It's hard enough telling it right now." The Defendant next attempted to contact her two days after this incident, on the morning of July 27, but the victim refused to answer his calls. After the victim refused to answer, the Defendant came to her house, but she stayed where she was, lying in bed with her daughter Lindsey, who had gotten in bed with her mother after her step-father left for work. As the Defendant knocked, Lindsey urged her mother to answer the door, but the victim told her daughter, "We're not going to open this door this morning. We're not going to talk to anybody this morning . . . ." The Defendant left, but called her the next day, on July 28. When she again refused to answer, he came again to her house, and her daughter, who knew nothing of the situation between the two adults, let her uncle into the house.

According to the victim, as the Defendant entered the house, he said he wanted to

10

"talk," and, because she felt sure her brother would restrain himself in front of her daughter Lindsey, she said, "Well, talk." The Defendant, however, grabbed the victim by the arm, pushed her into her bedroom, and locked the door behind him, saying that he wanted to talk "in private." The Defendant then sat down on the bed and pulled the victim down into his lap, wrapping his arms around her body to restrain her. The victim said that, in the process of doing this, the Defendant stabbed her buttocks with a syringe. The victim immediately knocked the syringe out and threw it at the Defendant. She testified she was unsure whether the Defendant was able to inject her with any of the syringe's contents before she knocked the syringe out. The victim recalled that, as this was all going on, her brother was telling her that he wanted sex. When the victim responded that "it was sick, it was perverted," the Defendant said that "sex was okay" and that she "didn't mind it." The victim did not know what the Defendant meant by this.

During this entire exchange, the victim's daughter Lindsey was beating on the bedroom door, wanting to know what was happening and to be allowed inside. The Defendant told Lindsey multiple times to "shut up and sit down." The victim fought to free herself from her brother's grip so she could open the door because she believed the Defendant would stop if Lindsey was watching. The victim finally freed herself, unlocked the door, and told the Defendant "to get the [hell] out of [her] house." The Defendant left.

When the victim's husband returned home from work, she told him what had transpired between her and her brother. She confirmed that they went that night to Officer Evans's house to report the rape. She recalled being nervous, upset, and ashamed. She did not submit a written statement about her brother's conduct, and she testified that she had never seen the narrative Officer Evans prepared summarizing her disclosure to him. The officer discussed installing a recording device on their phone and told them to call if the Defendant contacted her again.

After July 28, the day the Defendant last came to the victim's house, the Defendant did not contact the victim for several months. In November, however, he began calling the victim again. After the victim informed Officer Evans that the Defendant had called, she and her husband executed a waiver allowing a recording device to be installed on their phone, and the device was installed. Officer Evans instructed the victim to tell the Defendant she would meet him again in order to elicit an admission from the Defendant about what he had done to her. The victim said that her brother called again the day after police installed the device. The call was cut off mid-way through their conversation, and the victim used this break in the conversation to call Officer Evans to inform him of the Defendant's call. The officer came to her house, and shortly thereafter the Defendant called the victim back. As the two spoke, the officer "sort of [used] sign language" to tell the victim what to say,

11

generally encouraging her to get the Defendant to admit to raping her.

The transcript of the phone call reflected that the Defendant, at various points, referred to having given the victim "something twice" and "again the other day" and to the victim having agreed for him "to give [her] something again" "tomorrow definite[ly]." The victim explained that she had not seen the Defendant since July 28 and that he was referring to the fact that she had agreed to let him inject her again, though he did not realize she did this in order to elicit an incriminating response from him. In another portion of the transcript, the Defendant mentioned that the victim "called [him] and wanted [him] to come out and help [her]." The victim explained that he was referring to a phone call she made to him, at Officer Evans's behest, telling the Defendant she wanted to meet him "to get [the Defendant] led up to this so he wouldn't think anything about [the set-up]."

Several days after the recorded conversation, the victim went to the local police station and gave a written statement, which was introduced into evidence. Reviewing a copy of this statement, which contained several dates that had been crossed out and changed to reflect different dates, the victim confirmed she authorized these changes to her statement. Viewing a second statement introduced by the State, the victim confirmed it was a copy of a "more detailed" statement she gave several days after her first statement.

Addressing her history with prescription drugs, the victim said that "to her knowledge" no doctor or hospital had ever denied her medication. She said that, when she visited a doctor to seek treatment for her migraines, either she or her husband, who usually "did the talking," would tell the doctor that Stadol injections usually eased her migraine pain well. She denied ever "demanding" Stadol from any doctor. She said that, although she may not have received the exact medication she requested when she visited a doctor, she was always able to obtain some form of medication for her migraine.

The victim said she never asked her brother to come to her house to inject her with medication. She emphatically stated she never agreed to have sex with her brother in exchange for drugs. The victim explained she would never have sex with anyone for drugs because she could get any medication she needed from a doctor or, in the worst case scenario, an emergency room. She said, "There's no sense in me having to do anything like that to get medicine for my migraines."

On cross-examination, the victim agreed she could not remember the exact dates she believed her brother raped her in August and September of 2004. She said that she had received injections of Nubain, Stadol, and Demeral in the past to treat her migraines but that she did not know what medication the Defendant had administered to her in 2004 and 2005. She reiterated that the injections her brother gave her caused a "different" feeling from those

12

caused by the medications she had previously used. The victim was unsure of the quantities she customarily received of her prescribed medications, but knew that most of the medications were paired with Phenergan to balance the nauseating effects of the painkillers. She denied ever visiting a doctor and specifically requesting a certain quantity of any medication.

The victim agreed that she had received injections from the following sources: Dr. Ladd; two nurse practitioners named Ms. Woodard and Ms. Mary Todd Linville; staff at the Carthage General Emergency Room; and staff at Trousdale Medical Center Emergency Room. The victim acknowledged that she and Dr. Ladd "had some words" in August 2004 about her use of medication.

The defense introduced several of the victim's medical records. The first document reflected that she received an injection of Nubain and Phenergan from Dr. Ladd on August 2, 2004. Another document from Dr. Ladd's office, dated August 3, 2004, stated that the victim called back five hours after her August 2 injection, complaining of a migraine headache and requesting another injection. The document also contains a notation that "[the patient] is reaching addiction." The victim said she was not "going to deny" having asked for injections two days in a row because her migraines often last three to five days, and she sometimes, though "seldom[ly]," asks for more than one injection.

The victim confirmed she could only narrow the day on which her brother first raped her to sometime between August 8 and 14. The victim did not know why her brother drove her to the doctor on August 19, 2004, rather than injecting her at home as he had done the week before. She again testified that, when she visited a doctor, her husband would identify what medication usually worked, and, if he was not present, she herself would identify the medication.

The victim's medical records showed that she, accompanied by her husband, made the following series of doctor visits, receiving a total of nine shots in thirty-two days: On September 2, 2004, she received a shot of Stadol and Phenergan from Dr. Ladd. On the morning of September 7, 2004, she visited Dr. Ladd's office again but, finding his office too "backed up," she went to nurse practitioner Mary Todd Linville in Lafayette, Tennessee. Later that day, she then went to the Macon County Emergency Room where she received medications including Darvocet. Two hours after leaving the Macon County Emergency Room, she went to the Trousdale Medical Center and asked for Stadol. The record from her visit to the Macon County Emergency Room contains a notation that the victim did not exhibit an obvious aversion to light or sound, a common symptom of a migraine. The victim returned to Dr. Ladd's office on September 8, 2004, and received another shot of Stadol and Phenergan. On September 10, 2004, the victim again went to Dr. Ladd and received a shot

13

of Stadol and Phenergan.

The next week, the week of the alleged second rape, the victim received a Stadol and Phenergan shot from Dr. Ladd on September 13, 2004, and again on September 15, 2004. On September 21, 2004, the Defendant drove the victim to Dr. Ladd's office, where she again received Stradol and Phenergan. She returned to Dr. Ladd's office again on September 22, 2004, and September 24, 2004, and each time received Stradol and Phenergan injections. On October 4, 2004, the Defendant again drove the victim to Dr. Ladd's office, where she received another Stradol and Phenergan injection. Later in the day, the victim was admitted to Tennessee Christian Medical Center ("TCMC").

According to the medical records of her visit to TCMC, Dr. Ladd sent the victim to TCMC to be evaluated for back pain and a history of urinary tract infections. According to the records, the victim requested Stradol, saying it was the only medication that relieved her migraine pain. The record states, "Patient seems to be in denial in regards to this problem." Although the person preparing the medical record attempted to confront the victim about her use of prescription drugs, the victim acknowledged that she took too much medication but insisted that she would continue to take each medication because a physician had thought each medication was necessary for her treatment. The record recommended that the victim seek outpatient treatment for her use of prescription drugs.

About two weeks later, on October 22, 2004, Dr. Ladd again sent the victim to TCMC, and the record of that visit identified the reason for admission as "headache, overdose." According to the hospital record, the victim had arrived at Dr. Ladd's office earlier in the day "intoxicated" and passed out. She requested a shot of Nubain and Phenergan. After Dr. Ladd sent her to TCMC the victim "ramble[d] on and on"and said that if her headache were treated, "[her] heart would be okay," and she made several other "blatant attempts" to obtain drugs. According to the records, the victim denied that she had a prescription drug addiction and refused to be treated for addiction. Another document from this visit notes the "clinical impression" that the victim was exhibiting "drug-seeking behavior."

The victim acknowledged that, three days after her second visit to TCMC, she had a "falling out" with Dr. Ladd. She identified a disagreement with a woman named "Charla" as the cause of this falling out, saying she was unaware whether the doctor refused to see her again because of her prescription drug use. Despite Dr. Ladd having informed her he would no longer treat her, the victim again came to his office on October 28, 2004, requesting Stadol nasal spray to treat her migraine. The victim testified that she has used Stadol Nasal Spray, vicodin, percocet, hydrocodone, demerol, and darvocet to treat her headaches. The record from this visit indicated that, on this day, she was seen by nurse practitioner "Dr.

Woodard," who gave the victim only Phenergan, not Stadol, and talked with the victim about obtaining "narcotic therapy." The next day, October 29, 2004, the victim returned to Dr. Ladd's office and was seen by nurse practitioner Mary Todd Linville. The record from this visit indicated that the victim again requested Stadol nasal spray, and the nurse called Dr. Ladd three times to request permission to give the victim Stadol. After receiving no response from Dr. Ladd, the nurse refused to prescribe the victim Stadol and instead sent her home with a prescription for Phenergan.

The night of October 29, 2004, the victim visited Trousdale County Medical Center, complaining of headaches and nausea and requesting Stadol Nasal Spray. She did not disclose her recent failed attempts to receive Stadol from Dr. Ladd's office.

The victim agreed that it was "possible" that, according to her medical records, she received sixty-five shots in a fifty-two week period from 2004 to 2005 and thirty-five shots in 2005 alone.

The victim repeated her testimony that the shot her brother administered to her in August 2004 felt "strange" and "hit [her] faster than and different than an ordinary shot in the rear." The victim acknowledged that she allowed her brother to inject her again in September 2004, even though the previous shot had been so different from what she expected and she woke up in a different room when the shot wore off. She emphasized that she did not ask the Defendant to give her the shot and that she only agreed to let him inject her after he called her and offered to do so. She insisted that she did not remember what happened while she was unconscious the first two times her brother administered drugs to her in 2004. Consequently, the drugs' effect was the only thing that left an impression upon her; she suspected nothing of her brother at the time.

The victim agreed that the first written statement she submitted to police about her brother's conduct stated that he injected her the second week of August 2004, the second week of September 2004, and the third week of July 2005. She said that, when police requested a more detailed statement, she told them that the third incident occurred two days after the third week of May 2005, contrary to her first statement. Shortly thereafter, the victim again changed her statement, saying the third incident actually occurred during the third week of July 2005. The victim testified that she was never "unsure" of the dates of each incident, explaining that the errors were the result of "a misunderstanding when the first statement was written or typed out."

Reviewing the November 29, 2005, statement Officer Evans helped her prepare, she agreed that she did not mention that the substance her brother administered to her in August 2004 was "cloudy," but she explained that the officer never asked her about the substance's

15

appearance. She said, however, that she told him the substance had an effect different from any other drug she had taken, though the officer did not include this in the November 29 statement. She agreed that neither her November 22 nor her November 29 statement mentioned that her groin area contained semen after the July 25 incident, but she explained the semen could not have been collected because she had already showered. The victim testified that she tried to give Officer Evans all the important information he needed but explained, "This is a very embarrassing, disgusting thing."

The victim agreed that, as her November 29 statement sets forth, the Defendant had given her injections a few times before August 2004. She explained that she had not changed out of her pajamas when the Defendant arrived to take her to the doctor because she normally wore her pajamas to the doctor's office. The victim recalled that, after the Defendant forced her into her bedroom on July 28, the two engaged in a heated discussion, which culminated in her raising her voice and calling him "sick" and "perverted." She said her daughter Lindsey was standing by her bedroom door when the Defendant picked up the syringe with which he had tried to inject her, and left the house.

On re-direct examination, the victim reiterated that she first learned of the first two rapes on July 27, 2005, when the Defendant cornered her in her bedroom, insisting she had "not minded" the first two times they had sex. She explained that, when he told her this, she realized he could be telling the truth because, on each of the two prior occasions, she had fallen asleep and awoke on her bed, just as she did in July 2005 when she found her brother removing her pants. She said that, whereas she had remained unconscious for approximately an hour and a half during the first two incidents in 2004, she drifted in and out of consciousness during the July 2005 incident. The victim emphasized that, when she allowed her brother to take her to the doctor in August, September, and October of 2004, she "had no idea" he had raped her while she was unconscious in August and September.

The victim said that, in addition to Dr. Ladd, several nurse practitioners treated her when she went to Dr. Ladd's officer for treatment. The victim typically spent only two to four minutes with each physician. She was taking daily doses of Topomax and Nitroglycerine at the time she was Dr. Ladd's patient, and both these medications caused her to feel drowsy and impaired her coordination.

The victim estimated she had received five Stadol injections before her brother injected her in August 2004. She said none of these had ever affected her in the way her brother's injections affected her.

On re-cross examination, the victim agreed that, when her brother informed her on July 28, 2005, that they had sexual intercourse two times before July 25, 2005, he told her

the intercourse had been consensual.

The victim's daughter, L.P.[1], who was eleven in July 2005, confirmed she was home when her uncle, the Defendant, came to the home she shared with her mother and step-father in Red Boiling Springs. She recalled that, as she was lying on the couch on July 28, 2005, she heard a knock at the door. She answered the door and found her uncle, who was wearing his EMT uniform. The Defendant entered, saying, "[W]here's mom, I've got to talk to her." At that point, the victim emerged from her room, and the Defendant "grabbed her arm and pulled her into the bedroom [and] shut the door." L.P. heard the lock turn on the other side of the door, and she returned to the couch.

Soon, the victim's daughter heard her mother scream, "[L]et me go and get out," three to four times. At that moment her stepfather called, and she told him her mother was talking with the Defendant, so her stepfather said to have the victim call him back. A few minutes later, L.P. heard her mother again say, "[L]et me go and get out." She then heard her mother trying to unlock the door. She explained that she knew someone was trying to unlock the door because, due to the small size of the bedroom, the lock "tripp[ed]" occasionally. Someone eventually unlocked the door, and the Defendant emerged from the room. As he walked toward the front door, he stopped briefly in front of the television and said, "[T]his ain't a big deal." The victim again told the Defendant to "get out," and after the Defendant left, her mother locked the door behind him. L.P. did not know what the Defendant was referring to at the time.

On cross-examination, L.P. said that nothing initially alarmed her when her uncle arrived to her house on July 28. She explained that she was not scared when her uncle grabbed her mother by the wrist and took her into her bedroom because she "loved [her] family and didn't think [anything about it]." She agreed that, had she believed her mother was in danger, she would have tried to help her mother. Although L.P. could not make out much of her mother and uncle's conversation over the sound of the television, she clearly heard her mother say "let me go and get out" three or four times, which scared L.P. L.P. did not hear her mother call the Defendant "sick" or "perverted." As the Defendant walked out of the house, L.P. was "shocked" to see that he was carrying a syringe. Her stepfather called right as the Defendant was leaving, and she told him that her uncle had been in the bedroom with her mother.

L.P. had never seen her mother fight with her uncle as they did on July 25. She also had never seen them together alone in the bedroom. She explained that when her uncle had come to the house previously, she was usually outside playing.

---

[1]In the interest of privacy, we will refer to the victim's daughter as "L.P."

The defense moved for a judgment of acquittal, which the trial court denied.

Dr. Robert Ladd, a family practitioner, testified that in 2004 and 2005 he practiced in Portland, Lafayette, and Red Boiling Springs, Tennessee, but he had since retired. He confirmed that he employed nurse practitioners Mary Linville and Edna Woodard in his practice. Dr. Ladd recalled treating the victim in 2004 and 2005, saying her primary complaint was headaches. He confirmed that he usually treated the victim by giving her injections of either Nubain and Phenergan or Stadol and Phenergan. He explained that Nubain and Stadol are similar narcotic substances.

Dr. Ladd first confirmed that TennCare had given his office "prior approval" to prescribe the victim Stadol. He explained that TennCare paid for the victim's medications. The doctor confirmed that a record dated October 22, 2004, prepared by a nurse practitioner in his practice, reflected that the victim arrived at his office on that day "intoxicated," "arrousable but confused, staggering," and fell asleep in the waiting room. The victim complained of headaches. The "treatment" section of the record reads, "[C]alled crisis team judge, brother and sister included, drug task force, called Dr. Ladd for involuntary help. They wanted to admit her for a twenty-four hour admit." Attached to the record was a document from TCMC reflecting that the victim came to that facility on the same day, complaining of head and chest pain but refused "against medical advice" to be admitted to the psychiatric unit of TCMC. The document identified the victim as a drug addict.

The doctor reviewed a second record from his office dated October 22, 2004, and confirmed it reflected that the victim came to his office on that day suffering from "overdose, headache" and then was taken from his office by ambulance. A third record, dated October 28, 2004, prepared by Nurse Woodard, reflected that the victim came to his office, complained of a headache, and asked for Stadol Nasal Spray and Phenergan, which she was refused. A fourth record, prepared by Nurse Linville, reflected that the victim returned to his office the next day and again asked for Stadol Nasal Spray, which she was again refused. The doctor confirmed that a record from Trousdale Medical Center showed that the victim arrived there the next day, requested Stadol Nasal Spray, which Trousdale Medical Center dispensed to her. According to the document, the victim did not disclose that Dr. Ladd's office had refused to provide her with Stadol Nasal Spray.

Dr. Ladd testified that, based upon the number of trips the victim made within a short time period, he concluded that the victim was addicted to Stadol. The doctor said that, based upon this conclusion, he sent the victim a letter informing her that his office would no longer treat her.

On cross-examination, the doctor confirmed that his license to practice medicine was

suspended for one month and that his DEA certificate was suspended for six months. He confirmed that in 2006, after coming under investigation by "the board," he agreed to surrender his license.

The doctor confirmed that he did not see the victim when she arrived at his office on October 22, 2004, and could not, therefore, attest to whether she arrived "intoxicated" and "confused, staggering," as the record indicates. He confirmed that, at the time he treated the victim, she was taking Lortab, Phenergan, and "a number" of medications for her heart condition. He said these medications could make her dizzy but was not aware of any of these medications causing confusion.

On re-direct examination, the doctor explained that the determination of whether a patient is a drug addict is difficult but that requesting medication "too frequently" is a strong indicator of drug addiction.

Tracy Dozier, sister of both the victim and the Defendant, testified that in 2004 and 2005 she lived down the road, in visible distance, from the victim in Red Boiling Springs. The victim had also enlisted her help in driving her to Dr. Ladd's office to seek Stadol shots. Dozier testified that she reached a point, however, at which she grew "uncomfortable" with driving the victim to get these shots. Her discomfort was due to the fact that she was not sure her sister needed every shot and the fact that, after she dropped her sister off after such a visit, she believed her sister resumed driving despite being impaired by the medication. Also transporting the victim was an inconvenience to Dozier, who was living with and caring for their elderly mother at the time.

Though Dozier testified that "sometimes" her sister appeared to legitimately need medication, she said that at other times her sister would "cut up" on the way to Dr. Ladd's office but "act like she just couldn't hardly go" when she entered Dr. Ladd's office. Dozier informed her sister she would no longer transport her, explaining that she needed to care for their mother and that, if the victim was truly sick, she needed to admit herself to a hospital. After this, the victim stopped calling Dozier to ask her to take her to get shots.

Dozier testified that, at this time, her sister had "slim" credibility in the community. She said that, at one point, she witnessed her sister lie to the Department of Children's Services ("DCS") when DCS came to the victim's house to investigate a complaint. They came to her porch and requested she show them the medication she was taking, and she returned with a bag of medicine that did not contain the painkillers she used.

On cross-examination, Dozier confirmed she was not present when her brother injected her sister.

19

On redirect examination, Dozier testified that her sister said "there would be hell to pay for the person that called [DCS] on her." According to Dozier, the Defendant filed the complaint with DCS.

Patrick Warren, a team leader/supervisor with DCS, testified that in October 2004 and again in January 2006 someone filed a complaint about the victim's drug use to DCS. Each time, DCS investigated and concluded that the complaint was "unfounded." He said that, while DCS cannot disclose the identity of the source of such a complaint, he could disclose that the Defendant was not the person who made the complaints against the victim.

On cross-examination, at defense counsel's insistence, the trial court ordered Agent Warren to disclose the source of the complaints against the victim. The agent identified L.P.'s biological father as the source of the complaints. He confirmed the victim was not aware of the source of the complaints before this in-court disclosure. He said that, because he was not present during the investigation of either complaint, he did not know what steps agents took to investigate the complaints.

Based on this evidence, the jury found the Defendant guilty of three counts of sexual battery, three counts of incest, and one count of attempted sexual battery.

## B. Sentencing

According to the Defendant's presentence investigation report, the Defendant, forty-three at the time of sentencing, was a certified EMT and had seven children. His current wife, whom he married in 2006, became pregnant with his fourth child, their first of three, in 2001 when she was seventeen and he was thirty-six years old. The Defendant was employed by the Macon County Ambulance Service as an EMT from 1998 to 2005, when he was terminated due to the allegations in this case. He then began working for Pride Care Emergency Medical Services but was fired from this job after being convicted in this case. The Defendant had no criminal convictions, though he was charged with sexual assault in 1998 and with theft in 2001. Also, the Defendant was charged with passing a worthless check seven times, but he "paid off" each check in the form of a cash bond. According to a psychosexual evaluation of the Defendant, which was included in the presentence report, the Defendant presented only a "low risk" of re-offending. The report indicated that the Defendant's daughter, B.D.[2], reported to DCS that the Defendant, who had full custody of her at the time, sexually abused her. B.D. subsequently withdrew her allegations, but she continued to live with her mother.

---

[2]In the interest of privacy, we will refer to the Defendant's daughter as "B.D."

20

The presentence report included a victim impact statement from the victim. In this statement, the victim said that the Defendant had violated her trust and that she felt ashamed due to the nature of his crime against her. She claimed the Defendant had been speaking badly about her in their community. She said she was afraid of what the Defendant would do to her daughter in retaliation for reporting his conduct. The victim said that her sister and her step-father have refused to speak to her since she reported her brother's conduct. She said that, since pressing charges against the Defendant, she has isolated herself in her home, only leaving to buy groceries or visit the doctor. She said that, since the incidents in this case, she has suffered from depression and has had difficulty being intimate with her husband.

The victim testified at the sentencing hearing, describing the way her brother's conduct affected their family. She reiterated much of what was in her victim impact statement, explaining further that she stayed at home because everyone in her small town knew about what happened between her and her brother. She said, "It's just embarrassing. I know I'm the talk. Everybody is talking about me." The victim believed the Defendant and his family were spreading rumors about her drug use as well.

The victim recalled that, though she began experiencing depression when her grandmother died in 2003, her depression worsened after the rapes. As a result, she began receiving specialized counseling and began taking a higher dose of her anti-depressant. The victim stopped seeing her counselor about a year before sentencing because the counselor was transferred, and the victim did not want to tell her story to another counselor. However, at the time of sentencing, the counselor had begun seeing patients in a more accessible location, so the victim had arranged to resume seeing her.

On cross-examination, the victim explained that, because she was raised by her grandparents, she did not live with her brother, the Defendant, when she was a small child, but she said she had known the Defendant all her life and lived with him when she was older. She said she had grown to trust her brother in some areas, though she alluded to not trusting him in other areas. She said that, though she occasionally asked him to drive her to the doctor, he frequently called her to ask for various favors, such as cutting his family's hair and lending him money. She said that, since she reported the rapes, her brother had not attempted to contact her or anyone in her immediate family.

The victim expressed her belief that the Defendant would not stop offending until he was kept "completely away from people in general" and received treatment from a specialist. She elaborated:

> I'm not the kind of person [who] wishes something bad on anybody.

21

I'm a Christian, and it doesn't–it matters, but yet it doesn't matter. I mean, deep down in my heart, that is my brother. That's my blood brother, and down in my heart, regardless of what he did, I still love him because the Lord tells me I'm supposed to love him.

I want him to get help because he has a problem, he is sick. And something that I worry about a lot is he's going to do the wrong thing to the wrong person and somebody is going to end up killing him and then his children aren't going to have a father at all.

At least if he's behind bars to where he can get this out of his system and in a few years possibly get out and then be a father to them, that's one thing. But if he does this to somebody, the wrong person and they kill him, then his kids don't have anybody.

So, yes, I want him to get help, but I feel like he needs to be put away and get help, because if you don't like I said, and he messes with the wrong person, he's going to end up dead, and then like I said, those kids aren't going to have anybody.

. . . .

[I]t's not just me that he's done this to. There's plenty more out there that he's done this to that hasn't come forward, and maybe I shouldn't bring that up, but there's plenty more. And if he gets away with this scott free, it's going to happen again, and again, and again, and then he's going to end up dead, and I've got nieces and nephews out there that I'm concerned about.

William Henry Moss testified that he had known the Defendant for about thirty years and had worked with the Defendant at the Macon County Ambulance Service for seventeen of those years. The Defendant and Moss were partners for three of these years, and Moss said the Defendant was a dependable, rule-abiding employee who always showed up during the time of an emergency.

Moss, who lived about a mile from the Defendant at the time of sentencing, said he was comfortable with the Defendant being released into the community on a term of probation. Moss believed the Defendant would comply with the terms of any probation sentence he received. Moss knew the Defendant to always work to support his family and knew of no other source of income his family would have without the Defendant to provide financial support.

22

On cross-examination, Moss said that, during the three-year period he was the Defendant's partner, they worked twenty-four hour shifts and then were off for forty-eight hours. Moss said he met the Defendant when the Defendant was a juvenile and he himself was working as a police officer. He recalled that, occasionally, when the Defendant "messed up or something like that," he would "go out and talk to him about it." Moss did not remember every such incident but recalled that, one time, he had to talk to the Defendant about breaking bottles in the road. He recalled that, on these occasions, the Defendant listened to him and thanked him.

Moss said he occasionally paid social visits to the Defendant where he lived with his family, sometimes dropping in to visit his children, other times to have dinner together. Moss said he did not recall the Defendant ever speaking to him about his sexual encounters. He said that, though he knew the Defendant had been convicted of sexual battery and incest, he believed the Defendant should be allowed to return to his job as an EMT.

Randy Carter, an EMT with Macon County Ambulance Service, testified that he lived one house down from the Defendant and worked with him in the Ambulance Service for several years. He testified that the Defendant had a good work ethic, always trying his best and making himself available to work overtime. Carter said that, although he was aware of the Defendant's crimes, he believed the Defendant would comply with the terms of any probation sentence he received. He testified that he had observed the Defendant play with his family in their front yard and go on camping and boating trips with his family. He said that when his own children had been sick, the Defendant called to check on them. Carter said the Defendant's wife did not work and would have no source of financial support if the Defendant were not allowed to work to support her and their children.

On cross-examination, Carter said he was aware of the circumstances surrounding the Defendant's crimes, namely that he had injected his sister with Stadol to "knock her out." He testified that neither he nor the Defendant are authorized to give injections of Stadol or any other narcotic substance.

Jackie Barlow testified that he had known the Defendant for ten years through his job with the Macon County Ambulance Service. He said that he observed the Defendant "just about every day" and said the Defendant was "good with the patients" and "real concerned about his patients." He said the Defendant was an "extremely concerned" parent and that he had always supported his children. He recalled that, after the Defendant lost his jobs with the Macon and Wilson County Ambulance Services because of the crimes in this case, he helped the Defendant get a private-sector job in Nashville. He said he believed the Defendant would comply with any term of probation he received.

23

On cross-examination, Barlow said he was not aware that one of the Defendant's daughters, B.D., lived with her mother rather than with the Defendant. He said that, though he occasionally saw the Defendant around town, he did not visit his home on a regular basis. Though Barlow knew of the Defendant's convictions, he was not aware that the Defendant told his sister their sexual encounter was "good clean fun" that could not result in a pregnancy. He also was not aware that the Defendant's ex-wife paid child support to him.

Brian Dozier, the Defendant's seventeen-year-old son, testified that, when he was in grade school, his parents divorced, and he and his three siblings went to live with their father, the Defendant. Brian said his father had always financially supported him and attended his football practices and games. At sentencing, Brian lived with his father, his step-mother, his two brothers, and the three children his father has with Brian's step-mother. On cross-examination, Brian confirmed that his mother paid child support to his father. He also said that his step-mother, though she is not disabled, did not work but instead stayed home to care for his brothers and sisters.

At the conclusion of the sentencing hearing, the trial court imposed a total effective sentence of nine years and ordered the Defendant to serve two years in confinement and the rest on probation. The court also ordered the Defendant to register as a sex offender, to be monitored by a GPS device, to maintain full employment, and to undergo another psychosexual evaluation.

## II. Analysis

On appeal, the Defendant contends the trial court erred when it: (1) denied his Motion for Judgment of Acquittal; (2) imposed consecutive sentencing; and (3) imposed a period of confinement in excess of one year as part of a sentence of split confinement.

### A. Sufficiency of the Evidence

The Defendant argues the trial court erred when it denied his Motion for Judgment of Acquittal because the evidence did not corroborate the Defendant's admissions, which he argues, were largely the basis for his convictions. He says that the only corroborative evidence was the victim's testimony that she found semen inside her thigh and that this testimony only established sexual battery, not incest, which requires penetration. The State responds that the evidence necessary to corroborate such an admission need only "tend to connect" the Defendant to the crime at issue, and, as such, the evidence is more than sufficient to corroborate the Defendant's admission and thereby support his convictions.

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as

follows:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R.Crim. P. 29(a). This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See generally Overturf v. State*, 571 S.W.2d 837 (Tenn.1978). By presenting evidence, however, a defendant generally waives his ability to appeal a trial court's denial of his motion for a judgment of acquittal. *Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007) (declining to revisit *State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979)).

In this case, the trial court denied the Motion for Judgment of Acquittal the Defendant raised at the close of the State's proof. Following this denial, the Defendant presented evidence. The Defendant, therefore, waived his right to appeal the denial of his Motion for Judgment of Acquittal. *See Finch*, 226 S.W.3d at 317. The State, however, treats the Defendant's objection on appeal as an objection to the sufficiency of the evidence supporting his convictions. We will likewise treat his claim as one challenging the overall sufficiency of the evidence, and in doing so, we will address all evidence, not just that brought during the State's case-in-chief.

The standard by which the trial court determines a motion for judgment of acquittal is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the

25

circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

It is a well-established principle of law in this state that a conviction cannot be founded solely upon a defendant's confession, and that, in order to establish the "corpus delicti," there must be some corroborating evidence. *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000) (citing *Ashby v. State*, 124 Tenn. 684, 139 S.W. 872, 875 (1911)). Literally, corpus delicti means the body of the crime. Two elements, which must be proven by the State beyond a reasonable doubt, make up the corpus delicti: "(1) That a certain result has been produced, and (2) That the result was created through criminal agency." *State v. Ervin*, 731 S.W.2d 70, 71-72 (Tenn. Crim. App. 1986). Whether the State has sufficiently

established the corpus delicti is primarily a jury question. *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999).

While the corpus delicti cannot be established solely by the defendant's statements, any other statements may be considered along with any other evidence, both direct and circumstantial to prove the corpus delicti. *Shepherd*, 902 S.W.2d at 901. Where there is a confession, the corroborative evidence "need not be as convincing as the evidence necessary to establish a corpus delicti in absence of any confession." *Ricketts v. State*, 192 Tenn. 649, 654-55, 241 S.W.2d 604, 606 (1951). The "'evidence is sufficient if . . . it tends to connect the defendant with the commission of the offense, although the evidence is slight, and entitled, when standing by itself, to but little consideration.'" *Smith*, 24 S.W.3d at 281 (quoting *Ricketts*, 241 S.W.2d at 606). The corpus delicti may be proven by circumstantial evidence, and "only slight evidence" of the corpus delicti is required to corroborate a confession and to sustain a conviction. *State v. Ellis*, 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000); *State v. Jones*, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). "It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Opper v. United States*, 348 U.S. 84, 93 (1954). "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." *Taylor v. State*, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972). "In sum, as long as this very modest corroboration requirement is satisfied, the ultimate truth or falsity of the defendant's confession is a determination left to the jury." *State v. Housler*, 193 S.W.3d 476, 491 (Tenn. 2006).

We note first that, in this case, corroboration is not necessary for the Defendant's attempted sexual battery conviction because the evidence supporting that conviction includes the victim's direct testimony that the Defendant had sex with the victim after sedating her. The conviction was not solely based on the Defendant's admissions. We will address, therefore, the tendency of the evidence to support only the Defendant's remaining convictions.

The victim's testimony about being sedated by her brother, waking up on her husband's side of the bed, and, during one incident, finding her brother undressing her corroborates the Defendant's admissions, thereby bolstering their veracity to the point that they form a legitimate basis for a finding of guilt. In the course of his telephone conversation with the victim, the Defendant acknowledged that, after administering drugs to his sister, the two had sexual intercourse. He said this happened three times.

The victim, in her trial testimony, said the Defendant intravenously gave her drugs in August 2004, September 2004, and July 2005. She almost immediately lost consciousness each time her brother injected her with these drugs. The first two times her brother injected

her, in August and September 2004, the victim did not remember anything that happened from the time she lost consciousness in her living room and when, hours later, she woke up in her bedroom on her husband's side of the bed. The third time her brother administered her drugs, however, in July 2005, the victim woke up shortly after losing consciousness to see her brother removing her underwear and pants while she lay on her bed. The victim began to go in and out of consciousness, waking briefly to see her brother remove his own pants and again to see him standing at the foot of the bed, with his back turned, stepping back into his pants. The victim testified that she then experienced a strong "feeling," which she could not completely describe, that the Defendant had just raped her. Enraged and afraid, the victim lunged for the gun she stored in her closet and aimed it at her brother. The victim again lost consciousness but woke later to find the Defendant departed and a semen-like substance on her inner upper thigh.

The victim's testimony that contains her recollection of the occasions during which, according to the Defendant, the two had sexual intercourse, corroborates the Defendant's account of the incidents. During each of the first two incidents, the victim was not awake, and thus did not recall her brother actually penetrating her body. The victim was, however, awake to observe and confirm that, on these occasions, her brother administered medication to her intravenously in her living room and that, when she awoke later, she was lying on her bed. Because the corroborative evidence necessary to support the corpus delicti need only support "the essential facts . . . to justify a jury inference of their truth," these memories confirm sufficient aspects of the Defendant's account to "connect the [D]efendant with the commission" of incest and sexual battery, in that they connect him to the place and time of the first two rapes. *Opper*, 348 U.S. 84 at 93; *Smith*, 24 S.W.3d at 281.

Lending further support to the corroborative tendency of this evidence is the victim's broader recollection of the third incident. When the Defendant came to the victim's home in July 2005, the victim awoke briefly to witness her brother undressing her and later himself. After she completely awoke, she found semen between her legs. The details of this memory not only corroborate the Defendant's account of this third rape, but also are similar to the details of the two prior incidents, and, therefore, relate back to the 2004 incidents to corroborate the Defendant's account of those incidents as well. *See Shepherd*, 902 S.W.2d at 901. The victim's testimony, perhaps of "little consideration" standing alone, in conjunction with the Defendant's admissions, establishes the corpus delicti of incest and sexual battery. *See Smith*, 24 S.W.3d at 281. We, therefore, conclude that the jury properly credited the Defendant's taped statements acknowledging his sexual penetration of the victim and found him guilty of incest and sexual battery. *See Housler*, 193 S.W.3d at 491. He is not entitled to relief on this issue.

**B. Sentencing**

28

The Defendant next contends the trial court erred when it aligned three of the Defendant's sentences consecutively and again when it ordered the Defendant to serve more than one year of confinement as part of a split confinement sentence. We address both contentions below.

## 1. Alignment of Sentences

The Defendant argues the trial court erred when, based on its finding that the Defendant was a "dangerous offender," it imposed partial consecutive sentencing without making several *Wilkerson* findings, which this Court has repeatedly held must accompany such a sentence. The State agrees that an analysis of the *Wilkerson* factors is necessary but argues that the trial court's explanation of its decision, though brief, implicitly shows the trial court considered the *Wilkerson* factors.

It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the following seven factors exists:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

29

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b)(1)-(7). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Rule 32(c) of the Tennessee Rules of Criminal Procedure instructs a trial court to explicitly recite on the judgment its reasons for imposing a consecutive sentence.

Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our Supreme Court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. *Id.*; *State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004).

At the conclusion of the sentencing hearing, the trial court noted that, in preparation for the sentencing hearing, it reviewed the presentence report, read the psychosexual evaluation of the Defendant, read the sentencing memorandum submitted by the Defendant, and considered all the applicable law. The trial court noted that the facts of this case were "quite egregious" and that this case involved, rather than one continuous act, three separate, "deliberate" acts and one attempted act. The court acknowledged that the Defendant had no prior criminal convictions, no history of drug use, and a positive employment history. The trial court found, however, that due to the "very, very serious series of criminal events," "the circumstances of this case [were] so severe" that confinement was necessary to avoid depreciating the seriousness of the offense. Based upon this, the trial court denied the Defendant's request for an alternative sentence.

Noting that it was "uncomfortable" sentencing the Defendant beyond the statutory minimum, it sentenced the Defendant to three years for each of his three incest convictions, one year for each of his three sexual battery convictions, and eleven months and twenty-nine days for his attempted sexual battery conviction.

The trial court then addressed the alignment of the Defendant's sentence. It noted that the Defendant "was administering drugs he had no business administering" and "abusing a

30

position of trust, not only to his sister, but a position of trust in the community." It also noted that, in spite of the victim saying, "[S]top, stop, I'm losing consciousness," the Defendant "kept right on pumping her with a drug." Based upon this behavior, the trial court found that the Defendant exhibited "extreme behavior" and "an extreme disregard for human life," which made him a "dangerous offender," within the meaning of the consecutive sentencing criteria (4). *See* T.C.A. § 40-35-115(b) (2006). On this basis, the trial court imposed consecutive sentencing as to his three three-year sentences for incest but allowed his remaining convictions to be served concurrently, for a total effective sentence of nine years.

In sum, in the course of imposing consecutive sentencing in this case, the trial court found that the Defendant exhibited "extreme behavior" and "an extreme disregard for human life." It omitted entirely, however, any analysis of whether "an extended sentence [was] necessary to protect the public against further criminal conduct by the defendant" and whether "the consecutive sentences reasonably relate[d] to the severity of the offenses committed." *See Wilkerson*, 905 S.W.2d at 938-39. The trial court appears to have focused only on the statutory language of the "dangerous offender" category and failed to consider the *Wilkerson* factors necessary to base consecutive sentencing on the "dangerous offender" category. T.C.A. § 40-35-115(b)(4). Because a determination of the *Wilkerson* factors by the trial court must accompany any imposition of consecutive sentencing based upon T.C.A. section 40-35-115(b)(4), we must reverse the trial court's imposition of consecutive sentencing. Further, following our careful de novo review of the record, we cannot conclude that consecutive sentencing pursuant to T.C.A. § 40-35-115(b)(4) is supported by the evidence in this case. Therefore, we order that the Defendant's sentences be served concurrently, for a total effective sentence of three years, with one year to be served in confinement and the rest on probation.

### 2. Split Confinement Totaling over One Year

Having reversed the consecutive alignment of the Defendant's sentences we need not rule on the merits of the Defendant's claim that the trial court erred when it imposed consecutive sentences of split confinement, resulting in a split confinement sentence with a total of two years of confinement. However, we note that Tennessee Code Annotated section 40-35-306(a), the statute governing split confinement, prohibits the trial court from sentencing the Defendant to more than one year in jail as a part of split confinement sentence. That statute reads, "A defendant receiving probation may be required to serve a portion of the sentence in continuous confinement *for up to one (1) year* in the local jail or workhouse, with probation for a period of time up to and including the statutory maximum time of the class of the conviction offense." Tenn.Code Ann. § 40-35-306(a) (emphasis added). In our view, the consecutive alignment of split confinement sentences resulting in a confinement period of over one year runs afoul of Section 40-35-306(a). *See State v. Matthew I. Tart*,

E2009-01315-CCA-R3-CD, 2010 WL 1610515, *3 (Tenn. Crim. App., at Knoxville, Apr. 21, 2010).  Thus, the portion of the trial court's judgment ordering the Defendant to serve his three split confinement sentences consecutively, for a total of three years in confinement, was also in error.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude the evidence was sufficient to support the Defendant's convictions, but the trial court erred when it sentenced the Defendant.  As such, we reverse the trial court's judgments and order the Defendant's sentences to be served concurrently, for a total effective sentence of three years, with the first year to be served in confinement and the remainder on probation.

_____
ROBERT W. WEDEMEYER, JUDGE